# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **DEBRA BOEHMER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 4:04cv0819 TCM** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405 (g) for judicial review of the final decision of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying Debra Boehmer's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433. Ms. Boehmer ("Plaintiff") has filed a brief in support of her complaint; the Commissioner has filed a brief in support of her answer.[1]

## Procedural History

Plaintiff applied in October 2002 for DIB, alleging a disability since January 2001 as a result of her irritable bowel syndrome, gastroesophageal reflux disease ("GERD"), spastic colon, migraine headaches, anxiety, depression, and attention deficit disorder ("ADD"). (R.

---

[1]The case is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

at 63-65.)[2]  Her application was denied.  (Id. at 24, 48-51.)  Subsequently, a hearing was held, at Plaintiff's request, in September 2003 before Administrative Law Judge ("ALJ") Joseph J. Simeone.  (Id. at 237-55.)  The ALJ determined that Plaintiff was not under a disability at any time on or before the date of his decision, and denied her application.  (Id. at 17-23.)  The Appeals Council denied Plaintiff's request for review of that decision, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 3-5.)

### **Testimony Before the ALJ**

Plaintiff, represented by counsel, testified at the 20-minute administrative hearing.

Plaintiff testified she was born on March 18, 1960, and was then 43 years old.  (Id. at 240.)  She was 5 feet 2 inches tall and weighed approximately 150 pounds.  (Id.)  She was married and had her three daughters, ages 14, 13, and 11, at home.  (Id. at 241.)  Plaintiff completed the tenth grade.  (Id.)

Plaintiff had two weeks left in a carpenter training program when she left after almost four years for health reasons.  (Id. at 242.)  After that, she worked two more years for a company named Albereese and part-time for UPS for five years.  (Id.)  After a hernia operation, her doctor recommended that she not work in any job that required lifting.  (Id. at 243.)

---

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

Plaintiff then had a series of jobs.  (<u>Id.</u> at 243-44.)  She went from job to job because she was not feeling well.  (<u>Id.</u> at 244.)  Specifically, her irritable bowel syndrome and bladder incontinence caused her to have accidents when at work.  (<u>Id.</u> at 245.)  Medication did not work.  (<u>Id.</u> at 246.)  She went to a psychologist for awhile because her problems were hard to deal with, but therapy did not help.  (<u>Id.</u>)  She had last seen the doctor about her colon about one and one-half years ago, but she needed to go back.  (<u>Id.</u> at 247.)

Plaintiff further testified that she was no longer taking any medication.  (<u>Id.</u> at 248.)  Neither medication nor diet helped.  (<u>Id.</u>)

Plaintiff also suffered from depression.  (<u>Id.</u>)  She had crying spells and memory problems.  (<u>Id.</u>)  She had considered suicide, but she had three children to raise.  (<u>Id.</u>)  She had headaches and problems concentrating.  (<u>Id.</u> at 249.)  Her hands hurt from carpal tunnel syndrome, and she needed to go back to the doctor for her hands.  (<u>Id.</u> at 250.)  Additionally, she often felt sick to her stomach.  (<u>Id.</u>)

When asked to describe her daily activities, Plaintiff reported that she got up around 6:00 a.m., prepared an egg sandwich for her husband, got her daughters up for school, and then, after they had left, lay down until about 10:30 a.m., ate lunch around 2:00 or 3:00 p.m., and then sat and watched television.  (<u>Id.</u> at 253.)  Within an hour after eating, she had to go to the bathroom.  (<u>Id.</u>)

## <u>Medical and Other Records Before the ALJ</u>

The documentary record before the ALJ included forms completed by Plaintiff as part of the application process; documents generated pursuant to that record; medical records; and medical evaluation reports.

As part of the application process, Plaintiff completed, in relevant part, a disability report, a work history report, a claimant questionnaire, and a pain questionnaire. In the disability report, Plaintiff listed September 18, 1999, as the date her impairments first bothered her and the date they prevented her from working. (Id. at 139.) She stopped working, however, in 2001. (Id.) Plaintiff listed seven physicians she had consulted for physical problems, six of which she was not currently seeing, and one hospital, where she had been treated following a 1999 motorcycle accident. (Id. at 141, 145-47.) The only physician that she was then being treated by was Dr. Leonard Guam. (Id. at 150.) She last saw him in September 2002 for kidney stones and was scheduled to have surgery in two weeks. (Id. at 10.) She also listed three health care providers that she had consulted about her depression. (Id. at 151.) In a section titled "Remarks," she reported that she had been hospitalized when she was in junior high school after she overdosed on drugs.[3] (Id. at 142.)

Plaintiff listed 17 employers in her work history report. (Id. at 125-26.) Five of these employers were in 2000; three were in 2001. (Id.) She worked as a receptionist for three employers. (Id. at 135.) This job required that she lift at most ten pounds and that she sit for five to six hours each day, walk, stand, and stoop for one hour, and write, type, or handle

---

[3]She did not identify the drugs.

small objects for six hours.  (Id.)  She worked for a chain store in customer service.  (Id. at 137.)  This job required that she lift at most 35 pounds, frequently lift less than 10 pounds, walk for 3 hours each day, stand for 8 hours, stoop for 3 hours, and write, type, or handle small objects for 6 hours.  (Id.)

In a claimant questionnaire, Plaintiff described her disabling symptoms as headache pain; incontinence, both urinary and fecal; GERD; irritable bowel syndrome; stress; depression; and ADD.  (Id. at 117.)  These symptoms are worse with strenuous activity.  (Id.)  She stays at home to be close to the bathroom.  (Id.)  She occasionally cooks breakfast and usually cooks dinner.  (Id. at 118.)  She has an incontinence accident if she lifts anything heavy.  (Id.)  Her children carry the laundry basket up and down the stairs.  (Id. at 119.)  She is trying to learn an embroidery software program and makes cards on the computer.  (Id.)  She has not been diagnosed with ADD but has the same symptoms as her daughter who has been diagnosed with the disorder.  (Id. at 118.)  She has no friends due to personality conflicts, and she also does not get along well with her family.  (Id. at 120.)  She has had 10 to 20 jobs in the last 2 years.  (Id.)  She quits these jobs when she gets "stressed out" and does not call in or go in to work.  (Id.)

In the pain questionnaire, Plaintiff  reported that her pain occurred daily and was in her esophagus and stomach.  (Id. at 113.)  Nothing relieved the pain, although she had tried medication and medical treatment.  (Id.)  She also reported that she had two or three urinary accidents a day, precluding her from being in public.  (Id. at 114.)  Asked why she did not wear "Depends," she replied that her clothes were not big enough.  (Id.)  The pain from her

headaches was a throbbing pain.  (Id. at 115.)  Twice a week she had "really bad" headaches, and the rest of the time she had "regular" headaches.  (Id.)  To alleviate the pain, she lay down in a dark, quiet room.  (Id.)  She also took a prescription medication for migraines, Imitrex, and over-the-counter medications.  (Id.)  She had been diagnosed with migraines.  (Id.)  Living with her three daughters and her preteen stepson was stressful and caused headaches.  (Id.)

An earnings report generated pursuant to Plaintiff's DIB application listed earnings for the years 1976, 1978 through 1989, inclusive, and 1991through 2001, inclusive.  (Id. at 52.)  Her highest annual earnings, $20,933.90, were in 1997.  (Id.)  In 2000, she earned her fourth highest annual earnings, $11,433.48.  (Id.)

Plaintiff's relevant medical records before the ALJ begin in April 1992 when she consulted Leonard D. Gaum, M.D.  (Id. at 229.)  She was six months pregnant and had right flank and abdominal pain.  (Id.)  She reported having similar pain a few weeks before and then passing a renal stone.  (Id.)  She appeared to be in no significant distress.  (Id.)  The laboratory findings were consistent with renal stones, and a conservative course of treatment with hydration and pain management was recommended.  (Id.)  It was noted that she would require further consultation after her pregnancy.  (Id.)

The pain became worse, however, and Plaintiff was admitted to St. Johns Mercy Medical Center on May 29 for pain management.  (Id. at 228.)  She underwent a cystoscopy.[4]

---

[4]A cystoscopy is the inspection of the interior of a bladder by means of a lighted tubular endoscope.  Stedman's Medical Dictionary at 435 (26th ed. 1995).

(Id. at 227-28, 230.) A stent was to be placed, but could not be due to resistance in her uterus. (Id. at 227.)

In October, Dr. Gaum performed a cystourethroscopy[5] on Plaintiff to remove ureteral calculus. (Id. at 223.) She reportedly tolerated the procedure well. (Id.) In November, Plaintiff underwent another extracorporeal shockwave lithotripsy[6] to remove ureteral calculi. (Id. at 222.) Again, she reportedly tolerated the procedure well. (Id.)

The next medical record is of a June 1995 hysterectomy and endoscopic bladder neck suspension performed by Dr. Gaum to help relieve Plaintiff's urinary incontinence. (Id. at 216-21.) The incontinence had been evaluated and had been determined to be anatomic in nature. (Id. at 220.)

The next medical records are dated four years later. Plaintiff was taken to an emergency room in September 1999 after the motorcycle she was driving crashed. (Id. at 154-61.) She had lacerations to her right elbow, and she lost consciousness for a few seconds upon arrival. (Id. at 155.) A CT scan of her brain showed no trauma. (Id. at 159.) Within a few hours, she was sitting up in bed and in no distress. (Id. at 156.) After the lacerations were sutured, she was discharged. (Id.)

Plaintiff next sought medical treatment in March 2001. On March 14, Plaintiff underwent a colonoscopy and gastrointestinal endoscopy "to evaluate her history of

---

[5]A cystourethroscopy is the inspection of the bladder and urethra by a lighted tubular endoscope. Id.

[6]A lithotripsy is "[t]he crushing of a stone in the renal pelvis, ureter, or bladder, by mechanical force or sound waves." Id. at 990.

abdominal cramping, bloating, intermittent diarrhea, and soft stools, as well as a family history of colon cancer." (Id. at 164.) Her only current medication was a prescription medication for the treatment of overactive bladders, Detrol. (Id. at 165.) The only condition that was not normal was congested internal hemorrhoids. (Id. at 164.) Random biopsies taken of her colon tissue showed no pathologic findings. (Id. at 164, 169.) A high fiber diet and fiber supplement were recommended, and a medication was prescribed for her abdominal cramping. (Id. at 164, 167.) She was also diagnosed with irritable bowel syndrome. (Id. at 165.) She was to follow up in three to four weeks. (Id. at 167.) There is no record of a follow-up visit.

In September 2001, Plaintiff did again seek medical attention for her abdominal cramping. (Id. at 172.) She had gone to the emergency room with complaints of severe abdominal pain. (Id.) It was then thought that she might have kidney stones. (Id.) The pain did not resolve, so Plaintiff returned to the hospital. (Id.) A CT scan showed the kidney stones. (Id.) The stones were surgically removed, and Plaintiff was discharged two days later with a "no lifting" restriction. (Id. at 173.)

In June 2002, Plaintiff underwent a second colonoscopy and upper gastrointestinal endoscopy, with results and recommended treatment the same as the first. (Id. at 183-85, 187-95.)

Susan Congers, M.D., treated Plaintiff from September 2001 to January 2002. (Id. at 197-211.) Plaintiff's medical history included a bladder suspension, a Caesarian-section, removal of gall bladder and ovaries, and removal of kidney stones. (Id. at 205.) Her medical

problems included irritable bowel syndrome, nephrolithiasis,[7] migraines, depression, allergies, and anxiety. (Id. at 208.) Her current medications were two anti-depressants, Prozac and Zoloft. (Id. at 204.) Dr. Conger discussed a healthy diet, exercise, self-breast exam, caffeine intake, and motor vehicle safety with Plaintiff. (Id.) She also prescribed a different anti-depressant, Celexa. (Id.) Three months later, Plaintiff consulted Dr. Conger about her depression. (Id. at 202.) She reported having more difficulty focusing and no relief from Prozac. (Id.) She also reported that she thought she might be ADD. (Id.) Although she had never been diagnosed as ADD, she had tried her daughter's ADD medication and it had helped. (Id.) Her sister was on a different anti-depressant, Wellbutrin, and she would like to try that. (Id.) Dr. Conger prescribed Wellbutrin, and referred Plaintiff for counseling and for a psychological evaluation to determine whether she did have ADD. (Id.)

A few weeks later, Plaintiff returned to Dr. Conger with complaints of headaches since her 1999 motorcycle accident. (Id. at 201.) Some of the headaches were relieved by Excedrin Migraine. (Id.) Plaintiff's prescription for Wellbutrin was continued, she was additionally prescribed a medication for the treatment of GERD, Zantac, and one for relief from chest pain, Nadolal. (Id.) Also, Plaintiff was advised to keep her appointment with Dr. Lafferty, see page 11, infra. (Id.) Plaintiff denied having suicidal thoughts. (Id.)

---

[7]Nephrolithiasis is the presence of renal calculi. Id. at 1183.

Again, a few weeks later, on January 14, 2002, Plaintiff consulted Dr. Conger about her continuing headaches and abdominal pain. (Id. at 200.) She had forgotten to get her prescriptions for Zantac and Nadolal filled. (Id.) Dr. Conger's impression was that Plaintiff had GERD and migraine headaches. (Id.) Before this appointment, at Dr. Conger's request, Plaintiff underwent an examination of her upper gastrointestinal tract and a small bowel series after a barium meal. (Id. at 198-99.) Other than revealing intermittent GERD, the results of both were normal. (Id.)

In September 2002, Plaintiff was examined by another physician, M. Brother, M.D., apparently in Dr. Conger's practice. (Id. at 197.) Dr. Brother noted that Plaintiff was not taking any medications and wanted to go on disability. (Id.) Plaintiff was reported to be very depressed and to have trouble focusing or sleeping. (Id.) She had urinary incontinence problems, but did not do any exercises, including Kegels. (Id.) She could not work because of emotional distress and could not afford the co-pays for doctor visits or medicine.[8] (Id.) Dr. Brother's impression was of Attention Deficit Hyperactivity Disorder ("ADHD") and prescribed a trial run of Ritalin. (Id.) Plaintiff was advised to start Kegel exercises, gradually increasing the daily number of repetitions to 100. (Id.) Plaintiff was to return for a follow-up visit in two weeks. (Id.) There is no record of her having done so.

Plaintiff did, however, consult Dr. Gaum two weeks later about her recurrent incontinence. (Id. at 214-15.) A cystourethroscopy showed a small functional bladder

---

[8]Plaintiff had reported that she did not receive Medicaid because of her husband's income, $60,000 a year, and that her husband would not give her the money for the co-pays. (Id. at 120.)

capacity. (Id. at 214.) A urodynamic study showed a normal flow, but some evidence of detrusor[9] instability. (Id. at 213.) The diagnosis was of a mixed type of incontinence. (Id.)

Also before the ALJ were the treatment notes of Julie Lafferty, M.D.[10] As noted above, Plaintiff was referred to Dr. Lafferty by Dr. Conger. Plaintiff apparently consulted Dr. Lafferty twice, first in January 2002 and again in February 2002. (Id. at 179-81.) Plaintiff reported that her chief complaints were her compulsive disorder and depression. (Id. at 180.) She had been sad throughout her life. (Id.) She spend a lot of time in bed, had low energy and self-esteem, and had "very bad" headaches. (Id.) She occasionally had passive suicidal ideation, but no homicidal ideation, psychosis, or panic disorder. (Id.) She did pull or cut her hair. (Id.) She was depressed due to her divorce. (Id.) She had been on Prozac, Zoloft, Xanax, and Wellbutrin. (Id.) The first and last had helped for a time, the middle two had not. (Id.) Plaintiff further reported that she had been married three times, including her current marriage. (Id. at 181.) Her first husband had beaten her; her second husband had left her for another woman. (Id.) She had two children, both adults, with her first husband and three with her second. (Id.) On examination, she was alert and oriented times three, but had a "low" mood. (Id.) She was diagnosed with a current major depressive disorder and generalized anxiety disorder. (Id.) She might also have ADD and

_____

[9]A detrusor is "[a] muscle that has the action of expelling a substance." Stedman's Medical Dictionary at 469.

[10]The records do not indicate Lafferty's educational qualifications; however, Plaintiff referred to her as an "M.D." in her disability report. See Id. at 151.

trichotillomania.[11]  (Id.)  Her Global Assessment of Functioning ("GAF") was assessed as 55.[12]  (Id.)  Although Plaintiff reported the next month that she had fewer headaches, her mood continued to be depressed and her energy and self-image continued to be low.  (Id. at 179.)  She was prescribed a medication for the treatment of ADHD, Concerta.  (Id.)  She was to return for a follow-up visit in four weeks; however, there is no record of her having done so.

The ALJ also had before him an unsigned Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff.  (Id. at 77-71.)  The form was dated December 6, 2002.  (Id. at 86.)  Plaintiff's primary diagnosis was "weak bladder"; her secondary diagnosis was irritable bowel syndrome.  (Id. at 77.)  Although the box labeled "None established" in the exertional limitations section of the PRFCA form was not marked, the only category that was marked was that relating to pushing and pulling.  (Id. at 78.)  Plaintiff was assessed as having an unlimited ability to do both.  (Id.)  The sections reflecting the evaluator's assessment of a claimant's lifting limitations and ability to sit, stand, or walk for any length of time were

---

[11]Trichotillomania is "[a] compulsion to pull out one's own hair."  Stedman's Medical Dictionary at 1852.

[12]"According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  Hudson v. Barnhart, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  See also  Bridges v. Massanari, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Manual at 34.

not marked.  (Id.)  After summarizing the medical evidence, the unnamed evaluator concluded:  "The above restrictions are due to her urinary incontinence, which would reasonably be expected to occur if lifting heavier weights."  (Id. at 79.)  As noted, however, there were no lifting limitations marked.  (Id. at 78.)  The evaluator further concluded that Plaintiff had no postural, manipulative, visual, or communicative limitations.  (Id. at 80-82.)  Her only environmental limitation was to avoid even a moderate exposure to vibrations due to her urinary incontinence.  (Id. at 82.)  The evaluator noted that Plaintiff had a history of not following up on her medical appointments and found it doubtful that someone with as much incontinence as described by Plaintiff would not wear "Depends."  (Id. at 83.)

Also in December 2002, M. Lee Borrine, Ph.D., completed a Psychiatric Review Technique Form ("PRTF"), assessing the severity of Plaintiff's mental impairments.  (Id. at 91-104.)  Dr. Borrine specifically considered the effect of Plaintiff's ADHD, depression, trichotillomania, and generalized anxiety disorder on her ability to function.  (Id. at 92, 94, 96, 101.)  He rated the effect of these impairments as "mild" on Plaintiff's ability to function in the area of activities of daily living and "moderate" on her ability to maintain social functioning and to maintain concentration, persistence, or pace.  (Id. at 101.)  There was insufficient evidence to assess whether they caused repeated episodes of decompensation.  (Id.)

Dr. Borrine further assessed the effect of Plaintiff's mental impairments on her ability to function in 20 categories of mental activities.  (Id. at 87-90.)  She was moderately limited in her ability to (a) understand and remember detailed instructions, (b) carry out detailed

instructions, (c) maintain attention and concentration for extended periods, (d) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (e) work in coordination with or proximity to others without being distracted by them, (f) complete a normal workday and workweek without interruptions from psychologically based symptoms, (g) interact appropriately with the general public, (h) accept instructions and respond appropriately to criticism from supervisors, (i) get along with coworkers or peers, and (j) respond appropriately to changes in the work setting. (Id. at 87-88.) She had no significant limitations or there was no evidence of any limitations in the remaining 10 categories. (Id.) Dr. Borrine further opined that Plaintiff should have a job with low social contact and be restricted to simple, repetitive tasks. (Id. at 89.)

## The ALJ's Decision

The ALJ found that the medical evidence established that Plaintiff had a severe incontinence problem and depression, but did not have an impairment or combination of impairments that precluded her from returning to her past relevant work as a cashier and receptionist. (Id. at 22.) She had the residual functional capacity to perform a full range of work at the light or sedentary exertional level. (Id.) Specifically, she could occasionally lift up to 20 pounds and frequently lift up to 10 pounds. (Id.) She had no limitations in her ability to sit, stand, or walk. (Id.)

In reaching his decision, the ALJ found that each of Plaintiff's two severe impairments was controlled by medication. (Id. at 19.) He further found that her complaints were not credible. (Id. at 19-21.) This finding was based on Plaintiff's failure to follow up on

recommended treatment; the alleviation of her symptoms by medication, the resurgence of the symptoms when she failed to take medication, her daily activities that require concentration, e.g., her interest in learning an embroidery software program, and her sporadic treatment history. (Id.) Although Plaintiff testified that she did not go to counseling because of lack of funds, she did not testify that she had ever been denied treatment due to lack of resources or that she had sought no-cost treatment. (Id. at 21.) Her allegations that she did not take psychiatric medications because they did not work was inconsistent with the evidence in the medical records that she did show improvement when being treated. (Id.)

When evaluating Plaintiff's credibility, the ALJ opined that Polaski[13] "speaks more to third party observations that [sic] the claimant's allegations. There are few third party observations corroborating the complaints." (Id. at 18.)

## Additional Medical Record Before the Appeals Council

After the ALJ entered his decision, Plaintiff's counsel submitted an April 2004 psychiatric evaluation of Plaintiff by Joy L. Liss, M.D. (Id. at 235-36.) Dr. Liss diagnosed Plaintiff with depression, ADD, and somatization disorder. (Id. at 236.) She assessed her GAF at 51.[14] The basis for this diagnosis and assessment was summarized as follows:

> [Plaintiff] presented with the following symptoms of depression and anxiety: she feels sad much of the time, she feels her future is hopeless and will only get worse, as she looks back, she sees a lot of failures, she gets very little pleasure from the things she used to enjoy, she is disappointed in herself, she is more critical of herself than she used to be, she has thoughts of killing

---

[13]Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).

[14]See note 12, supra.

herself, but would not carry them out, she feels like crying, but can't, she is so restless and agitated that it's hard to stay still, it is hard getting interested in anything, she has greater difficulty in making decisions than she used to, she feels more worthless as compared to other people, she does not have enough energy to do very much, she sleep [sic] more than usual, she is much more irritable than usual, her appetite is much less than before, it is hard to keep her mind on anything for very long, she is too tired or fatigued to do a lot of the things she used to do, she feels hot, she is unable to relax, she feels dizzy and lightheaded, her heart pounds, she is unsteady, she is nervous, she has feelings of choking, her hands tremble, she is shaky, she has indigestion or discomfort in abdomen. Her Beck Depressive Inventory was 42, which is in the severe category. She also presented with symptoms of [ADD] and a score of 39,[15] 20 is the minimum.

(Id. at 235.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 416.920, 404.1520. See also **Ramirez v. Barnhart**,

---

[15]Dr. Liss does not name the test attached to the score.

292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002); **Cox v. Apfel**, 160 F.3d 1203, 1206 (8th Cir. 1998). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 416.920(d), 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments[,]" **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added), and requires "a function-

by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,'" **Depover v. Barnhart**, 349 F.3d 563, 565 (8th Cir. 2003) (quoting S.S.R. 96-8p)). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility regarding subjective pain complaints. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). And, although a claimant need not be reduced to life in front of the television in order to prove that pain precludes all productive activity, see **Baumgarten v. Chater**, 75 F.3d 366, 369 (8th Cir.

1996), "[t]he mere fact that working may cause pain or discomfort does not mandate a finding of disability," **Jones v. Chater**, 86 F.3d 823, 826 (8th Cir. 1996) (alteration added).

After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. See **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998). The decision of an ALJ who seriously considers, "but for good cause expressly discredits, a claimant's subjective complaints of pain, is not to be disturbed." **Haggard v. Apfel**, 175 F.3d 591, 594 (8th Cir. 1999).

The burden at step four remains with the claimant. See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." **Cox**, 160 F.3d at 1206-07. When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050

(8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **Dunahoo**, 241 F.3d at 1037; **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

### Discussion

Plaintiff argues that the ALJ (a) erred in his conclusions about her RFC, (b) improperly evaluated her credibility, and (c) failed to undertake the required function-by-function analysis of her past relevant work. The Commissioner disagrees.

"[I]t is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel." **Nevland v. Apfel**, 204 F.3d 853, 857 (8th Cir. 2000) (alteration added). <u>See</u> also **Snead v. Barnhart**, 360 F.3d 834, 838 (8th Cir. 2004) (same); **Weber v. Barnhart**, 348 F.3d 723, 725 (8th Cir. 2003) (same). This duty arises "[b]ecause the social security disability hearing is non-adversarial . . . [and] the ALJ's duty to develop the record exists independent of the claimant's burden in the case." **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004) (alterations added). This duty requires that the ALJ neutrally develop the facts, **id.**, recontacting medical sources and ordering consultative examinations if "the available evidence does not provide an adequate basis for determining

the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004).

See also **Haley v. Massanari**, 258 F.3d 742, 749 (8th Cir. 2001) (holding that ALJ's duty to develop the record includes ordering a consultative examination when such an examination is necessary for the ALJ to make an informed decision); **Barrett v. Shalala**, 38 F.3d 1019, 1023 (8th Cir. 1994) ("The ALJ is required to order medical examinations and tests only if the medial records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."); 20 C.F.R. § 416.917 (setting forth criteria for when a consultative examination will be provided at Government expense). This duty does not arise, however, if a crucial issue is not undeveloped. **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th Cir. 2005); **Stormo**, 377 F.3d at 806. Additionally, although "[t]he current regulations make clear that [RFC] is a determination based upon all the record evidence," **Dykes v. Barnhart**, 223 F.3d 865, 866-67 (8th Cir. 2001), including "'the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations,'" **Krogmeier v. Barnhart**, 294 F.3d 1019, 1023 (8th Cir. 2002) (quoting McKinney, 228 F.3d at 863) (alteration added), "[t]he need for medical evidence . . . does not require the [Commissioner] to produce additional evidence not already within the record," **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (alterations added). The determination of whether an ALJ has failed in his or her duty to develop the record must be made on a case-by-case basis. **Gregg v. Barnhart**, 354 F.3d 710, 712 (8th Cir. 2003).

In the instant case, substantial evidence on the record as a whole does not support the ALJ's decision that Plaintiff's symptoms were relieved or controlled by medication. Instead, the opposite is true. When Plaintiff did sporadically seek medical treatment, she continually wanted to change medications. She stopped wanting to change only because, according to her testimony, the medications did not help. Her urinary incontinence was not cured by a bladder neck suspension, and she testified she was scheduled for a third colonoscopy.

As noted by the ALJ, a failure to seek medical treatment or to keep follow-up appointments may detract from the credibility of a claimant's testimony. <u>See</u> **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005); **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005); **Holley v. Massanari**, 253 F.3d 1088, 1092 (8th Cir. 2001). Plaintiff, however, had an explanation for her failure to keep follow-up appointments – she had neither Medicaid nor access to her husband's[16] money. And, although there is no evidence that Plaintiff was not denied medical care because of lack of funds, she was never asked if that had happened.

The ALJ did have before him evidence that Plaintiff had depression and anxiety disorder. The Appeals Council had before it evidence that Plaintiff had depression, ADD, and somatization disorder. "A somatoform disorder involves '[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.'" **Jones v.**

---

[16]Plaintiff's marital status is not clear from the record. She consulted Dr. Lafferty in 2002 about depression following a divorce. She testified in 2003 that she was married. Whether she was married for the fourth time or had not been divorced in 2002 is not in the record.

**Callahan**, 122 F.3d 1148, 1152 (8th Cir. 1997) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.07) (alteration in original).  The disorder "causes a belief that physical ailments are more serious than clinical data would suggest."  **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999) (citing <u>Merck Manual</u> 1590-91 (16th ed. 1992)).  "Psychiatric conditions at high risk for depression include anxiety disorder, somatization hysteria, . . ."  <u>Merck Manual</u> at 1594.

Plaintiff was not evaluated by a consulting examiner for her depression, anxiety disorder, ADD, or a somatization disorder.  Without such evaluation, the ALJ's assessment of her mental residual functional capacity cannot stand.  Accordingly, the case will be remanded with instructions to obtain a consulting examiner's report on Plaintiff's mental impairments.

On remand, the ALJ is advised that <u>Polaski</u> applies to a claimant's credibility,[17] not just the observations of third parties.  The ALJ is also advised that the name of the person completing the PRFCA form should be included and that all relevant limitations should be addressed.

## Conclusion

For the foregoing reasons, the Court finds that a remand is necessary for the ALJ to reevaluate Plaintiff's mental impairment, including obtaining a  consultative examination,

---

[17]The Court notes that although the ALJ mistakenly concluded that <u>Polaski</u> was primarily directed at the observations of third parties, he proceeded to evaluate Plaintiff's credibility under the <u>Polaski</u> factors.

have the PRFCA form properly completed, and reevaluate Plaintiff's credibility if appropriate. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED for further proceedings consistent with this Memorandum and Order.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of May, 2005.